42 A.3d 534

# ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Henry D. McGLADE, Jr.

Misc. Docket AG No. 6, Sept. Term, 2010.

Court of Appeals of Maryland.

April 24, 2012.

Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland, for Petitioner.

William Ray Ford, Esquire, Camp Springs, MD, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BARBERA, J.

On February 24, 2010, Bar Counsel, on behalf of the Attorney Grievance Commission (Petitioner), filed a petition, later amended, "For Disciplinary or Remedial Action" against Respondent, attorney Henry D. McGlade, Jr. The petition alleged a number of violations of Maryland Lawyers' Rules of Professional Conduct (MRPC) relating to Respondent's representation of Jerome G. Brewis.

The Honorable Pamela L. North conducted a three-day hearing and thereafter issued her written findings of fact and conclusions of law. Judge North found, by clear and convincing evidence, that Respondent violated MRPC 1.1 (Competence), 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer), 1.3 (Diligence), 1.4 (Communication), 3.3 (Candor Toward the Tribunal), and 8.4(a), (c), and (d) (Misconduct).

I.

Judge North made the following findings of fact: Respondent has been licensed to practice law in Maryland since 1984, with a focus on real estate. Jerome G. Brewis has been a client of Respondent since 1999. In January 2006, Brewis received a civil citation for building code violations (code violations) in connection with boathouses and piers located on his property at 8215 Parkway Drive, Pasadena, Maryland. Anne Arundel County (County) filed in the District Court of Maryland a complaint against Brewis for permanent and mandatory injunctive relief. Brewis asked Respondent to represent him in the matter. Brewis also approached another attorney, Steven Freeman (Freeman), who had represented him in other matters since 2002, to assist.

Brewis, Respondent, and Freeman held an initial meeting to discuss the District Court case. Respondent thought Brewis should litigate the case, and Freeman thought Brewis should

try to settle the matter. Freeman "dropped out of the case," at that time without entering his appearance.

Trial was originally scheduled for November 2006. Respondent took measures to prepare for trial on that date but ultimately sought a continuance due to scheduling conflicts. Nancy M. Duden (Duden), the County Attorney prosecuting the case, consented to the continuance. A consent motion was filed and granted by the District Court, postponing the trial date until February 1, 2007.

Respondent tried without success to reach Brewis several days before and on the trial date of February 1, 2007. On that day, Respondent and Duden met at the courthouse, where the two negotiated a proposed consent order based on terms that Respondent represented to Duden had been discussed with Brewis. Also present in the room at the time of the negotiations was Don Wooden, a Code Enforcement Officer with the Anne Arundel County Department of Inspections and Permits. Twice during the negotiations, Respondent stepped outside the room, saying that he was leaving to speak with Brewis. In fact, Respondent did not contact Brewis at either time. Duden, though, believed that Respondent was consulting with Brewis. Respondent entered the consent agreement on behalf of Brewis, which included that Brewis would pay $1625, which was the full amount of the fine for the code violations.

Respondent and Duden went into court and informed the presiding judge, the Honorable Danielle Mosley, that the parties had reached a consent agreement. Judge Mosley signed the consent order. Respondent paid the full amount of the fine, $1625, with a cashier's check. The consent order required Brewis to apply for permits for all of the cited structures within 30 days. Respondent did not speak with Brewis during that 30–day period, and he did not file any permit applications or requests for variances during that period. Respondent did not talk with Brewis about the con-

sent order until late March 2007.[1]

Between February and late March, Brewis attempted on multiple occasions and through various avenues to contact Respondent and eventually sought the assistance of Freeman in contacting Respondent. After multiple attempts, Freeman reached Respondent. At that time or sometime thereafter, Respondent explained to Freeman that he had entered into the consent agreement and order because he was unprepared to litigate the case on February 1, 2007, and he believed another postponement request would be denied. Respondent believed that entry of the consent order left open the possibility to challenge the code violations.

In late March 2007, Respondent met with Brewis to discuss the consent order. Respondent wanted to move away from Brewis's previous position of preserving all of the structures. At that point, Brewis had Freeman assume a larger role in the matter. Brewis was angry that Respondent had entered the consent order. At that same time, Respondent began drafting a building permit application, which was completed in July 2007.

At some point after expiration of the 30–day period for compliance with the consent order, during which no action was taken to comply with its terms, Duden filed a contempt petition. A show cause order was served on Brewis in May 2007. Brewis testified without contradiction that he did not agree to the consent order or have any knowledge of it, and he neither provided funds to pay the civil fine nor received a request from Respondent for reimbursement for his payment of the fine.

Freeman agreed to represent Brewis in the ongoing District Court case. John Dowling, a land surveyor Respondent had used as an expert in previous matters, advised Brewis that he

---

1. Respondent and Brewis gave somewhat conflicting testimony concerning when Brewis learned of the consent order—whether April or May 2007, as Brewis testified, or March 2007, as Respondent suggested in his testimony. Judge North resolved that dispute in favor of Respondent.

was willing to testify on Brewis's behalf in the District Court case. In early 2008, at the suggestion of Freeman, Brewis also retained Harry Blumenthal (Blumenthal) an experienced practitioner of land use administrative law.

Respondent continued to be involved in the case, preparing materials for the variance application, non-conforming use application, and permit applications. Freeman, Blumenthal and Respondent devised a strategy whereby Brewis could litigate the matter in an administrative proceeding, while simultaneously postponing the contempt proceeding. Litigation of the contempt proceeding was handled by Freeman. Blumenthal was to advise Freeman and handle the administrative part of the case. But once Blumenthal was hired in 2008, Respondent's role was reduced to serving as an historical reference. In the summer of 2008, Respondent's role in the case ended.

It was decided ultimately that the best course of action was to attempt to vacate the consent order. Freeman filed a Motion to Vacate the Consent Order in August 2008, which the County opposed. At the hearing on the motion, Respondent acknowledged that Brewis had not given him express authority to enter the consent order. The court granted the motion to vacate the consent order, and Duden refunded Respondent $1625 for the fine.

We quote below Judge North's conclusions of law [2]:

**_Rule 1.1 Competence:_**

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Comment 1 to Rule 1.1 states:

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature

---

**2.** We have deleted references to pages of the transcript and footnotes from Judge North's conclusions of law and findings of mitigation.

of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.

Comment 5 to Rule 1.1 states:

Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation.

In this case, Respondent was admitted to the Bar of the District of Columbia in 1984 and to the Bar of the Court of Appeals of Maryland in 1985. He also was admitted to the Bar of the United States District Court for the District of Maryland in 1992 and has continuously practiced law since his admission to the bar. His practice initially consisted of litigation, but after a couple years, his work focused on real estate and has continued a focus on real estate and litigation.

The case Respondent undertook for Brewis involved complex matters of real property including property lines, setbacks, variances, wetland licenses, county, state and federal regulations, and the legal status of numerous structures including piers, boathouses, cat walks, and boat slips.

Respondent took measures to prepare for the original November 2006 trial date, including examining the factual and legal elements of the problem. Respondent testified his first step was to conduct research, gather documents, and identify for which structures Brewis had obtained permits. Respondent filed Maryland Public Information Act requests in order to further investigate the existence of old permits. Moreover, Respondent filed paperwork requesting old aerial photographs of the property and contacted the Board of Public Works Wetland Administration regarding a wetlands license that Brewis obtained in 1992. He contacted officials at the Anne Arundel County Code Enforcement and Inspec-

tion Division hoping to find exceptions for small scale repairs, and prepared summaries of the structures for which he could find permits and those for which no permits could be located.

In addition, Respondent hired Permit Specialists to assist him in the filing of a building permit application, which would stay the District Court proceedings. Respondent testified that two weeks before the February 1, 2007 trial date, he concluded that Permit Specialists would not be able to follow through on their assistance with site diagrams. As a result, Respondent contacted Dowling to testify at trial, if needed.

Respondent testified he could have gone to trial on February 1, 2007, but this was not in the best interest of Brewis because Respondent's directive was to solve all of the issues involved with the structures on both the 8215 address and the 8217 address. Respondent stated he was confident he would have been able to prove the disputed structures were not on the property of 8215, but this would have simply resulted in a complaint filed by the County against the 8217 property, which is owned by Brewis's wife and step-daughter.

After signing the consent order, Respondent continued negotiations with the County, but was unsuccessful and assembled the materials necessary for a variance application and materials for a legal non-conforming use application.

Dowling, a licensed surveyor and attorney, testified Respondent had an "excellent reputation" among lawyers generally in Anne Arundel County.

Blumenthal, a qualified expert in land-use, administrative and real estate law, testified, in his opinion, Respondent did not competently handle Brewis's legal matters in this case. Blumenthal perceived the consent order, which admitted certain structures were illegal, represented a significant impediment to resolution of the matter through administrative remedies.

Blumenthal explained Respondent could not obtain the relief Brewis sought through the use of a variance, as a matter of law. Ultimately, even though Blumenthal testified the amended decision of the Office of Planning and Zoning, produced by [Sterling Perry] Seay, [who approved Brewis's legal non-conforming use application,] was "bizarre," the consent order was not an impediment to the resolution of the dispute through administrative means. Seay found that the boathouses were eligible for legal noncomforming use status because the County Code had been changed only recently in 2005 to prohibit boathouses. These boathouses pre-existed the change in the County Code.

Even though Blumenthal did not believe the February 1, 2007 consent order contained the flexibility needed to succeed through administrative means, Blumenthal admitted it would not be the norm and, in fact, an incredible feat to have negotiated an agreement with "absolutely no admission whatsoever of wrong doing or illegality of any of the structures."

Respondent's thoroughness and preparation were not lacking in his overall handling of this matter. This was not an easy problem; permits for all of the structures could not be found and Respondent did not have all the pieces necessary to put together the entire puzzle. As to Respondent's overall handling of the case, the Court finds no violation of Rule 1.1.

However, the Court finds that a reasonably competent attorney would know that express authority of the client is needed when entering into an agreement, culminating in a consent order of court, that purports to settle a dispute. In this case, Brewis testified that he did not have any knowledge of the consent order before the February 1, 2007 trial date. In Brewis's view, no discussions were held or specific plans made regarding entering into a consent order. In fact, Brewis had no knowledge of the consent order. Brewis testified he was unable to reach Respondent to discuss the consent order until May 2007.

Under these circumstances, Respondent had an opportunity to do the right thing. He knew he needed his client's permission to settle the case; that is why he was attempting to contact Brewis by telephone. He should have asked for a postponement. Even though Respondent testified he did not believe he would receive another postponement, and that he weighed the chances of attaining a postponement against the consequences of failing to be granted the continuance, he had a duty to seek a continuance when he was unable to contact his client and gain Brewis's permission to enter into the consent order. If the request for a postponement was denied, he would be precluded from entering into any settlement without the knowing consent of his client.

This lack of express authority is especially pertinent under these circumstances because the consent order admits the illegality of certain structures, agrees to the payment of a fine for County Code violations, and creates the legal obligation for Brewis to apply for permits within certain timeframes or face the removal of certain structures on his property.

As a result, the Court finds by clear and convincing evidence that Respondent's conduct fell below the standard of a competent practitioner when he entered into the consent order of February 1, 2007, without the express authority of his client, thereby violating Rule 1.1 of the Maryland Rules of Professional Conduct.

### Rule 1.2 Scope of Representation and Allocation of Authority Between Client and Lawyer:

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the

lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

Respondent entered into the February 1, 2007 consent order without the express authority of Brewis because "he felt it was in his best interest," and "the least poor choice among other poor choices." Respondent testified that he did not recall whether he called Brewis five days prior to February 1, 2007, but admitted that he did not have any notes in the file that mentioned any such contact.

Respondent admitted that he never spoke to Brewis about the February 1, 2007 proposed consent order that Duden sent him. Brewis testified that he never spoke with Respondent on February 1, 2007. He also testified that he never gave Respondent any authority to enter into the February 1, 2007 consent order, stating that he had "no prior knowledge of this consent order being entered into."

Rule 1.2 states specifically that a "lawyer shall abide by a client's decision whether to settle a matter." Respondent did not speak with Brewis regarding the content of the consent order and had no way of knowing what Brewis's decision would be. Respondent thereby entered into a consent order without appropriate authorization. As a result, the Court finds by clear and convincing evidence that Respondent violated Rule 1.2 of the Maryland Rules of Professional Conduct.

### Rule 1.3 Diligence:

A lawyer shall act with reasonable diligence and promptness in representing a client.

Comment 3 to Rule 1.3 states:

A client's interest often can be adversely affected by the passage of time or the change of conditions ... [e]ven when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

In this case, Respondent entered into a consent order, pursuant to which Brewis had 30 days to apply for permits

for structures that may have been illegal or face removal of such structures. However, there is no evidence Respondent made any effort to contact Brewis regarding the existence of the consent order or its 30 day requirements. Respondent testified that the first time he spoke with Brewis regarding the consent order was late March.

In addition, Respondent admitted that he did not file any permit applications or requests for variances in the 30 day period required by the order. Not only did Respondent wait almost two months to inform his client of the existence of an unauthorized consent order, he did not pursue the required permits referred to in the order, subjecting his client to additional legal problems, including contempt of court.

As a result, the Court finds by clear and convincing evidence that Respondent violated Rule 1.3 of the Maryland Rules of Professional Conduct.

***Rule 1.4 Communication:***

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined by Rule 1.0(f), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Respondent did not sufficiently communicate with his client, Brewis, either leading up to the February 1, 2007 trial date, or after signing the consent order. Even though Respondent testified he sent Brewis a fax with the new trial

date of February 1, 2007, Brewis denies ever receiving it, and Respondent did not have a receipt showing the fax went through. Brewis testified that he "never received any notice about a February 1, 2007 trial date."

Respondent's attempts to reach Brewis by phone before February 1, 2007 were weak, as well. Respondent testified he did not attempt to call Brewis until January 31, 2007, the day before the trial. Respondent ultimately was never able to contact Brewis on February 1, 2007, and did not even know Brewis was in Florida.

Just as important, however, are Respondent's actions after entry of the consent order. Respondent's duty to communicate with Brewis is arguably even more important after entering into the consent order because additional legal obligations were created. Respondent had an absolute duty to inform Brewis of the order because the clock was ticking on his ability to timely file permit applications for the disputed structures. In this case, there was absolutely no communication between Respondent and Brewis until late March 2007, well past the 30 day period outlined in the consent order.

Furthermore, Brewis explained that once he was informed of the consent order by Dowling, he had great difficulty contacting Respondent. Brewis testified that he called Respondent's cell phone and his office phone multiple times with no answer and no return calls.

Freeman testified when he first heard from Brewis in March or April 2007, he had problems contacting Respondent as well, making multiple phone calls and leaving multiple messages.

As a result, the Court finds by clear and convincing evidence that Respondent has violated Rule 1.4 of the Maryland Rules of Professional Conduct.

### Rule 3.3 Candor Toward the Tribunal:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

(e) Notwithstanding paragraphs (a) through (d), a lawyer for an accused in a criminal case need not disclose that the accused intends to testify falsely or has testified falsely if the lawyer reasonably believes that the disclosure would jeopardize any constitutional right of the accused.

Respondent did not exhibit sufficient candor towards the tribunal when entering the consent order in front of Judge Mosley. When Respondent and Duden agreed to the order, Respondent stated that he had "one small housekeeping chore;" he wanted to avoid the entry of a money judgment against Brewis.

Specifically, Respondent stated *"we* very much want to avoid the entry of a money judgment, so *we* have today paid the fines." (emphasis added.) The use of the word "we" in this circumstance implies that Respondent's client has consented to the fine and would like to avoid a money judgment. Respondent explained in his testimony he wanted to avoid a money judgment because Brewis is involved in finance and insurance and it is important to avoid money judgments due to his reliance on credit.

The Court finds this explanation unpersuasive. The fact that Respondent used "we" before the Court, coupled with the fact that Respondent paid the fine with his own money, never told Brewis about the fine, and never billed Brewis for payment of the fine, leads to the reasonable conclusion that Respondent was simply covering his own tracks and did not want Brewis to know about the consent order or the fine.

As a result, the Court finds by clear and convincing evidence that this was a misrepresentation to the tribunal and Respondent's intent was to keep the fine hidden from his client. Accordingly, Respondent violated Rule 3.3 of the Maryland Rules of Professional Conduct.

### *Rule 8.4 Misconduct:*

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

[* * *]

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

As a result of the above findings, the Court finds by clear and convincing evidence Respondent has committed violations of the Maryland Rules of Professional Conduct, thereby resulting in a violation of Rule 8.4(a).

Respondent also engaged in dishonesty and misrepresentation when he stated he was communicating with his client during negotiations with Duden on February 1, 2007. Duden testified she asked Respondent whether Brewis was in court and Respondent replied that "he was in cell phone contact with Mr. Brewis and that he could be there for trial within 15 to 20 minutes."

Furthermore, Duden testified that negotiations concerning the proposed consent order would start and stop because Respondent left the room to speak with Brewis and changes were made to the consent order based on the two phone calls Respondent purportedly had with Brewis. On cross-examination, Duden testified specifically, in addition to Respondent's statement that he could reach Brewis by cell phone and that he could be there in 20 minutes if needed, Respondent told her that he was leaving the room to call Brewis and the changes he made were changes that his client desired.

Respondent testified he never implied that he was in cell phone contact with Brewis. The fact that Respondent made these statements suggesting he was calling his client and re-entered the conference room to make changes to the consent order following these phone calls would lead a reasonable person to believe he was actually speaking with Brewis.

Deposition testimony of Don Woodrow (Woodrow), a Code Enforcement Officer with the Anne Arundel County Department of Inspections and Permits, who was also present during the consent order negotiations on February 1, 2007, supports Duden's characterization of Respondent's statements.

Woodrow stated there was much discussion regarding the consent order and Respondent stated, "[l]et me call my client and ask him." Woodrow testified Respondent explained, "Mr. Brewis would like some changes made," "this is what Mr. Brewis agreed upon by telephone," and that these changes were "agreeable by Mr. McGlade, that Mr. Brewis had okayed it." Woodrow also testified during his

deposition that at no point did Respondent indicate he could not get in touch with Brewis.

Based on the testimony of Duden and Woodrow, the Court finds by clear and convincing evidence that Respondent committed a violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct.

Moreover, some level of candor is necessary for the administration of justice. Meaningful resolution of claims is impaired when attorneys misrepresent their ability to enter into settlement agreements when, in actuality, no such authority exists. The culmination of this process, in this particular case, was the entry of a consent order before the Court that proved to be voidable; one which prejudiced the client's position and was later vacated based on an accurate understanding of the circumstances surrounding its entry on February 1, 2007.

The necessity to vacate court orders upon a showing of lack of authority on the attorney's part is prejudicial to the administration of justice, and the Court so finds by clear and convincing evidence Respondent violated Rule 8.4(d) of the Maryland Rules of Professional Conduct.

Following the hearing before Judge North, the case came before us to consider exceptions to the judge's findings of fact and conclusions of law, and for recommendations of sanction. For reasons we shall detail later in this opinion, we remanded the case to Judge North for her to make supplemental findings of fact concerning whether Respondent had proved remorse for his actions. Judge North conducted a hearing, at which she heard arguments of counsel for Respondent and Bar Counsel. Judge North thereafter issued the following supplemental findings of fact:

At the September 28, 2011, hearing on remorse, Respondent's counsel argued there was evidence of remorse in the record from the prior hearing. When Respondent was asked what remorse he had at the merits trial, Respondent testified:

> My remorse has reared its ugly head in several ways. I truly enjoyed working with Jerry Brewis over the years. I have tried to continue to be a good soldier and help them to make amends for it, but their view of me— Harry's view of me has changed. I've lost something. I've lost their respect.
>
> That same effect has occurred with my partners at work, with my family who I've shared it with, with my friends and colleagues. I've shared it because I have tried to own it. I have not run away from this. I've not lied about it. I tried to make the best of some bad judgment.

This testimony shows that Respondent was distressed about the negative consequences his actions had on many aspects of his life.

Respondent acknowledged he did not have his client's express consent to enter into the consent order. Respondent's counsel argued the fact that Respondent continued to work on Brewis's case with new counsel and that he testified truthfully at the hearing to vacate the consent order showed that he was remorseful for his actions. Respondent's counsel further argued that Respondent was fully cooperative with the Bar Counsel's investigation.

Although Respondent never lied about entering into the consent agreement without Brewis's consent, he did not inform his client of the district court's order. Brewis testified that he learned of the consent order only after his surveyor called and told him of it after the surveyor read about it in the newspaper. Respondent did not try to contact Brewis after he entered the consent order to inform Brewis that he had to obtain permits within thirty days or pay a fine. Respondent paid the fine himself the same day. The Court finds this was done so Brewis would not find out about the consent order.

Respondent testified he did not charge Brewis for his work in the case because he was "trying to make amends for entering the consent order without his express and prior consent." These actions do not show that Respondent was

remorseful about what he did, but instead show he knew that he should not have entered the order and attempted to keep it hidden from his client.

After Brewis was informed of the consent order, Respondent continued to work on the case with other counsel. He also testified truthfully at the hearing to vacate the consent order because he had "become aware that [he] had entered into avoidable or defective or faulty order, and [he] had to do [his] part to set it straight." Respondent helped Brewis remedy the situation he created, however, coupled with the fact that Respondent did not take any action to remedy the situation until Brewis found out about the consent order, these actions do not show remorse. Respondent had little choice but to admit to the district court judge he had no authority to enter into the consent order because his improper actions had been fully revealed.

The Court agrees with the argument of the Attorney Grievance Commission that Respondent's cooperation with the investigation does not show remorse. Respondent was simply doing what was required of him by his profession.

The Court finds that when viewed in the totality, although diminished by that fact that it appears that he tried to hide what he did from Brewis, Respondent's testimony proves some modicum of remorse by a preponderance of the evidence.

## II.

"This Court 'has original and complete jurisdiction' over attorney discipline matters." *Att'y Grievance Comm'n v. Keiner*, 421 Md. 492, 505, 27 A.3d 153, 161 (2011) (quoting *Att'y Grievance Comm'n v. Fox*, 417 Md. 504, 528, 11 A.3d 762, 776 (2010)). "Although we conduct an independent review of the record developed before the hearing judge, we will not disturb the hearing judge's findings of fact unless clearly erroneous. The hearing judge is entitled to weigh the evidence, assess the witnesses' credibility, and resolve any conflict in the evidence." *Id.*, 27 A.3d at 161 (citations omitted).

Petitioner takes no exception to Judge North's findings of fact or conclusions of law and recommends disbarment as the sanction for the violations found by Judge North. Respondent originally had two exceptions and recommends a short suspension of no more than six months. We can dispose quickly of one of them, as subsequent happenings make it no longer viable.

Respondent originally excepted to Judge North's failure to make findings concerning the mitigation evidence he presented at the merits hearing. He noted evidence of the following mitigation: a lack of any prior or subsequent disciplinary actions during his more than 25–year practice in Maryland and the District of Columbia; his "excellent reputation, particularly among lawyers in Anne Arundel County, Maryland who know of him and his work"; and his testimony at that hearing demonstrating his "remorse for his actions in the Brewis matter and for representations made to the Court at the time that he entered into the Consent Order on Mr. Brewis' behalf."

At oral argument before this Court Bar Counsel agreed with Respondent that Judge North had made no findings concerning the proffered evidence of mitigation. Bar Counsel conceded that Respondent enjoys a good reputation and has an unblemished disciplinary record. Bar Counsel was not willing to concede that Respondent demonstrated actual "remorse" for his actions. Respondent and Bar Counsel agreed to a remand, and we ordered one, limited to the only evidence of mitigation—remorse—still in dispute at that juncture. Following remand, Judge North heard from counsel and made the findings on remorse that we quoted above. The post-merits hearing occurrences—Bar Counsel's concession as to some of Respondent's asserted mitigation evidence and the hearing judge's supplemental factual findings resolving the then-only mitigation issue remaining in dispute—have rendered moot Respondent's exception that "evidence of mitigation should have been included in Judge North's [original] findings of fact and conclusion of law."

■ Respondent's only other exception relates to Judge North's finding that Respondent's use of the word "we" during the hearing before District Court Judge Mosley led Judge Mosley to assume that Respondent had consulted Brewis, who agreed to the consent order. Respondent argues that his use of the word "we" "was at best ambiguous in its reference" and was likely a "liberal, if not somewhat pretentious use of the pronoun," as in the "royal 'we.'" Therefore, Respondent asserts, Judge North made a factual error leading to a corresponding legal error that Respondent violated MRPC 3.3 (Candor Toward the Tribunal).

The record before Judge North included a transcript of the February 1, 2007 hearing at which Judge Mosley issued the consent order that Respondent had negotiated with Duden on behalf of, but without consulting, Brewis. The transcript discloses that the hearing before Judge Mosley lasted all of three minutes. Duden and Respondent were present; Mr. Brewis was not. Ms. Duden explained to Judge Mosley that she and Respondent "have negotiated and signed a Consent Order in this case also that we'd like the court to include" in the case file. The judge reviewed the order, made a few comments not pertinent here, then asked Respondent if he had any questions. To that, Respondent replied:

> Thank you, Your Honor, no. There is one small housekeeping chore that you might be able to provide some guidance with. I have an expectation that most Consent Orders in these matters wind [up] with the entry of a money judgment with a fine to be paid in a short period of time.
>
> **However, we very much want to avoid the entry of a money judgment, so we have today paid the fines.** That's indicated in the Order.
>
> My housekeeping concern, if you will, is that this order like many other similar orders is going to be treated similarly by the staff in the clerk's office. I wonder if there's a suggestion you might make to me of who I might speak to just to make certain that this one is treated differently and a money judgment is not entered.

(Emphasis added.)   Judge Mosley noted that she would "put in the file that, in fact, all fines have been paid.   Do not enter money judgment at this time."   The hearing concluded moments later.

In addition to considering the transcript of the hearing before Judge Mosley, Judge North credited the testimony of (1) County Attorney Duden, supported by the testimony of Code Enforcement Officer Don Woodrow, that Respondent had suggested by his conduct during the consent order negotiations that he was in communication with, and obtained the approval of;  (2) Brewis, who said that there had been no such communications;  and (3) Respondent, who admitted that he had paid the fine without discussing the consent order with Brewis.

Judge North found that Respondent's use of the word "we" during the hearing before Judge Mosley, "in this circumstance implies that Respondent's client has consented to the fine and would like to avoid a money judgment" and, when combined with the facts that Respondent used his money to pay the fine and never told Mr. Brewis about the fine or billed him for it, "leads to the reasonable conclusion that Respondent was simply covering his own tracks and did not want Brewis to know about the consent order or the fine."   That factual finding, which Judge North had the prerogative to make and is entitled to deference by us, *see Keiner*, 421 Md. at 505, 27 A.3d at 161, fully supports her legal conclusion that Respondent made a "misrepresentation to the tribunal," thereby violating MRPC 3.3.   The exception is therefore overruled.

Respondent, save for the one viable exception that we have addressed and overruled, does not contest Judge North's findings of fact or legal conclusions that Respondent violated MRPC 1.1, 1.2, 1.3, 1.4, 3.3, and 8.4(a), (c), and (d).   Upon independent review, we conclude that Judge North's extensive factual findings support each of her legal conclusions, by clear and convincing evidence.

### III.

We are left only to determine the sanction for Respondent's violations of Rules 1.1, 1.2, 1.3, 1.4, 3.3, and 8.4(a), (c), and (d). We have explained that "[t]he purpose of disciplinary proceedings is 'not to punish the lawyer, but to protect the public and the public's confidence in the legal profession.' " *Keiner*, 421 Md. at 522, 27 A.3d at 171 (quoting *Att'y Grievance Comm'n v. Sucklal*, 418 Md. 1, 10 n. 3, 12 A.3d 650, 655 n. 3 (2010)). The public is protected by deterring professional misconduct, by imposing sanctions upon attorneys who engage in conduct that "will not be tolerated," and "removing those unfit to continue in the practice of law from the rolls of those authorized to practice in this State." *Id.*, 27 A.3d at 171 (quoting *Sucklal*, 418 Md. at 10 n. 3, 12 A.3d at 655 n. 3). In determining the sanction, "we consider the egregiousness of Respondent's misconduct in conjunction with the established mitigation." *Id.*, 27 A.3d at 171.

Petitioner recommends disbarment "[d]ue to Respondent's lack of truthfulness, neglect, and incompetence. . . ." Respondent recommends a lesser sanction—no more than a six-month suspension. As we consider the appropriate sanction in this case, we shall focus on prior cases involving rule violations that stem from an attorney's lack of candor to the tribunal and/or the client, specifically in connection with the settlement of a case without the client's knowledge and consent, because it is that conduct by Respondent that lies at the heart of this disciplinary matter.

Bar Counsel, in seeking Respondent's disbarment, relies most heavily upon *Attorney Grievance Commission v. Vanderlinde*, 364 Md. 376, 419, 773 A.2d 463, 488 (2001), because here, as in *Vanderlinde*, the misconduct involved a form of intentional dishonesty. We conclude that the facts of this case do not come within the purview of the rule and undergirding rationale of *Vanderlinde*.

The attorney subject to disciplinary proceedings in *Vanderlinde* admitted to stealing funds from her employer. *Id.* at 381, 773 A.2d at 465. For that misconduct, we disbarred Ms.

Vanderlinde. *Id.* at 419, 773 A.2d at 488. In doing so, we set forth a rule that disbarment is the default sanction "in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like," absent any "compelling extenuating circumstances." *Id.* at 413, 773 A.2d at 485. We added: "[W]e will not accept as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC." *Id.* at 413–14, 773 A.2d at 485. We since have clarified, though, that the apparent "bright-line rule [of *Vanderlinde*] should be understood to apply only to 'the facts and circumstances of that case'—i.e., cases of misconduct involving intentional misappropriation, intentional dishonesty, fraud, stealing, and serious criminal offenses *where mental disability is offered as mitigation of the normal sanction of disbarment.*" *Att'y Grievance Comm'n v. Palmer,* 417 Md. 185, 211, 9 A.3d 37, 52–53 (2010) (quoting *Att'y Grievance Comm'n v. Lane,* 367 Md. 633, 647, 790 A.2d 621, 628–29 (2002)) (emphasis added). The case before us does not present such a scenario.

The present case is similar in material respect, though not identical, to two cases Respondent calls to our attention, *Attorney Grievance Commission v. Tanko,* 408 Md. 404, 969 A.2d 1010 (2009), and *Attorney Grievance Commission v. Gordon,* 413 Md. 46, 991 A.2d 51 (2010). In *Tanko,* we imposed a 60–day suspension on an attorney who, on behalf of a client, knowingly filed expungement petitions for charges ineligible for expungement, with the hope that the petitions would "slip through" the court. 408 Md. at 424, 969 A.2d at 1022. We determined that, although the attorney's conduct was "misleading" to the court, and therefore violated MRPC 3.3, it "[did] not rise to the level necessitating disbarment." *Id.* at 426, 969 A.2d at 1023. In *Gordon,* a reciprocal case in which the State Bar of Texas had imposed a public reprimand, 413 Md. at 49, 991 A.2d at 52–53, we suspended an attorney for 45 days as a sanction for intentionally misrepresenting

material information to a court. *Id.* at 64, 991 A.2d at 61.
The attorney, during representation of a client in a breach of
contract case, attached to a summary judgment motion an
exhibit that appeared to be an original signature page signed
five years earlier by the attorney's client. *Id.* at 50, 991 A.2d
at 53. In fact, the page was not the original, and had been
signed by the client the night before the exhibit was offered to
the court. *Id.,* 991 A.2d at 53. The attorney nevertheless
falsely portrayed the exhibit as being the original. *Id.* at 51,
991 A.2d at 53–54. At trial, the client testified on cross-
examination that he had signed the document immediately
prior to its introduction to the court. *Id.,* 991 A.2d at 54. The
attorney subsequently admitted that the document was not the
original. *Id.,* 991 A.2d at 54. After examining applicable
Maryland precedent, including *Tanko,* and citing mitigation
found in favor of the attorney (including the attorney's lack of
any disciplinary record and his demonstrated remorse for his
conduct), we imposed a 45–day suspension. *Id.* at 63–64, 991
A.2d at 61.

We also consider *Attorney Grievance Commission v. Gar-
cia,* 410 Md. 507, 979 A.2d 146 (2009). In that case, we
disbarred, *id.* at 529, 979 A.2d at 159, an attorney who pleaded
guilty in federal court to conspiracy to commit immigration
fraud, *id.* at 509–10, 979 A.2d at 147–48. The attorney's office
manager had drafted a false letter purporting to be from a
former employer of one of the attorney's clients, the attorney
knowingly signed the letter in the name of the purported
employer, *id.* at 516, 979 A.2d at 151–52, and the letter was
submitted to the Immigration and Naturalization Services
(INS) in support of the client's case, *id.* at 512, 979 A.2d at
149. "[B]ecause the hearing judge found, and we agree[d],
that '[Mr. Garcia's] action of signing the letter was clearly
intended to commit a fraud, deceive, or misrepresent,' " we
determined that disbarment was the appropriate sanction for
Garcia's conduct. *Id.* at 522, 979 A.2d at 155 (third alteration
in original). *See also Att'y Grievance Comm'n v. Wingerter,*
400 Md. 214, 221–22, 929 A.2d 47, 51–52 (2007) (attorney
disbarred for conspiracy to defraud the Internal Revenue

Service, failing to make any effort to stop the fraud, and taking at least two steps to conceal the crime). Respondent's conduct, while certainly severe, does not involve criminal conduct.

On the mitigation side of the ledger, we consider Respondent's violations in light of Bar Counsel's acknowledgment that Respondent has an unblemished disciplinary record and enjoys a good reputation as a lawyer. We also take account of Judge North's finding that Respondent demonstrated only a "modicum of remorse." That finding, standing alone, suggests that Judge North found "a moderate or small amount" of remorse. *See* The Random House Dictionary of The English Language (2d ed. 1987) (defining "modicum"). But when read together with her other findings in connection with Respondent's evidence of remorse, we conclude that Judge North found little remorse, at best. Judge North found that Respondent's testimony concerning how he felt about his misconduct demonstrated, not so much remorse for that conduct, but rather "distress[ ] about the negative consequences his actions had on many aspects of his life." Judge North further found no remorse in connection with either Respondent's continuing to work for free on Brewis's case, or his truthful testimony at the hearing to vacate the consent order, admitting, to his detriment, his actions in obtaining the consent order and failing to inform Brewis about it. Judge North found that "these actions do not show remorse. Respondent had little choice but to admit to the district court judge he had no authority to enter into the consent order because his improper actions had been fully revealed." And the judge agreed with "the Attorney Grievance Commission that Respondent's cooperation with the investigation does not show remorse. Respondent was simply doing what was required of him by his profession."

The appropriate sanction in this case must be greater than the sanctions imposed in *Tanko* and *Gordon,* because Respondent's conduct—negotiating a settlement without his client's knowledge while suggesting to opposing counsel that the client was being consulted and, worse, suggesting thereafter to the

court that the negotiated consent order had his client's approval—was more severe than that in either of those cases. The sanction, though, ought not be as severe as the disbarment ordered in *Garcia,* as Judge North did not find that Respondent committed a crime or perpetrated an actual fraud upon the court. Moreover, we do not overlook Respondent's fine reputation as a lawyer, his otherwise unblemished disciplinary record, and the "modicum" of remorse found by Judge North.

All of the above, taken together, leads us to conclude that the appropriate sanction for Respondent's rule violations is an indefinite suspension.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST HENRY D. MCGLADE, JR.**